66 P.3d 1234

**STATE of Arizona, Appellee,**

v.

**Shawn Ryan GRELL, Appellant.**

No. CR–01–0275–AP.

Supreme Court of Arizona,
En Banc.

April 1, 2003.

Janet A. Napolitano, Arizona Attorney General, by Kent E. Cattani, Chief Counsel, Capital Litigation Section and Monica Beerling Klapper, Assistant Attorney General, Phoenix, Attorneys for Appellee.

James J. Haas, Maricopa County Public Defender, by Lawrence S. Matthew, Deputy Public Defender and James R. Rummage, Deputy Public Defender and Shughart, Thomson, Kilroy, Goodwin & Raup, by Rudolph J. Gerber, Phoenix, Attorneys for Appellant.

## OPINION

BERCH, Justice.

¶1 On December 2, 1999, Shawn Grell drove his two year old daughter, Kristen, to a remote area near Apache Junction, poured gasoline on her, then lit her on fire. She died from severe burns and smoke inhalation. The trial court found Grell guilty of first degree murder and sentenced him to death.

¶2 Direct appeal to this court is mandatory under Rules 26.15 and 31.2(b) of the Arizona Rules of Criminal Procedure. We have jurisdiction under Article 6, Section 5(3), of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 13–4031 (2001). We remand for a determination of whether Grell is mentally retarded and therefore ineligible for the death penalty pursuant to the United States Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

## FACTS

¶3 On November 29, 1999, Shawn Grell left work early, claiming that he was needed at his girlfriend's house. He never returned to work. He spent the next few days at the home where he lived with his daughter, Kristen, his girlfriend, Amber Salem, and Amber's parents.

¶4 On the morning of December 2, Amber dropped Kristen off at a daycare center. Later that day, Grell picked Kristen up from the center, signing Amber's name instead of his own on the sign-out sheet.

¶5 That afternoon Grell drove to Mesa with Kristen. At 5:40 p.m., he stopped at a convenience store to purchase beer and a sports drink. About an hour later, Grell bought a red plastic gas container at a department store in Mesa. He continued to drive around Mesa before stopping at another convenience store where he bought just over a gallon of gasoline. Still later that evening, Grell entered a convenience store in Apache Junction, but apparently did not buy anything.

¶6 Grell then drove to a remote area near Apache Junction, took his sleeping daughter out of the car, and laid her on the ground in a drainage ditch approximately fifteen feet from the road. Kristen woke up as her father poured gasoline over her. He then lit a match and flicked it on her, setting her on fire. Kristen stumbled around, walking at least twelve feet before falling to her knees and then collapsing face down in the dirt. She died from smoke inhalation and severe burns over 98% of her body. Only the bottoms of her feet were not burned.

¶7 After watching Kristen fall to her knees, Grell returned to his car and drove around briefly before returning to see if the fire had gone out. He then returned to one of the convenience stores he previously visited to purchase more beer. He told the worker at the cash register that he had just seen some kids light a dog on fire in the nearby desert. He said, "I can't believe that kids would set a dog on fire[;] this is what the world is coming to when kids set dogs on fire."

¶8 For several hours, Grell drove around and drank beer. Just before midnight a Phoenix police officer pulled Grell over on suspicion of driving under the influence. Grell handed the officer a bottle of beer he had been drinking, and the officer eventually released Grell to walk home.

¶9 Grell apparently returned to his car after the officer left and continued driving because around two a.m., another Phoenix police officer stopped Grell. This time the officer arrested Grell and took him to the police station, where breath tests confirmed that he had a blood alcohol content of approximately .16. After processing Grell, the officer released him and a taxi cab took Grell to Third Avenue and Van Buren.

¶10 From there, Grell walked to the state capitol, where he used a call box to telephone the Capitol Police Department. Grell told the capitol police several times that he had killed his daughter and informed them where he left her body. After confirming that an infant's body was found where Grell indicated it would be, the police arrested him on suspicion of murder.

¶11 At the scene, police investigators found Kristen's badly burned and lifeless body, tire tracks that were consistent with

the tires on the car Grell was driving that day, large and small shoe impressions in the dirt that were consistent with the shoes that Grell and Kristen were wearing, and a book of matches with one match missing. They also found some partially burned candy, a melted hair clip, and various articles of partially burned clothing. Police recovered a red plastic gas container that appeared new and still contained a small amount of gasoline. Grell's fingerprints were found on the gas can. Finally, investigators noted several areas of burnt soil and a strong smell of gasoline in the area.

¶ 12 Kristen's body was found face down, and her clothes, hair, and body were badly burned. An autopsy revealed that she suffered third and fourth degree burns over 98% of her body. According to the lead detective, the positioning of Kristen's body, the burn patterns on her clothes and body, the burn patterns on the ground near her body, and other evidence collected at the scene were all consistent with Kristen having had gasoline poured on her body and then being lit on fire. The autopsy revealed that Kristen's death resulted from thermal injuries and smoke inhalation.

¶ 13 Several months after his arrest, Grell signed a "Prisoner Media Waiver" informing him that "statements made to reporters, newspersons and other members of the media may be used against you in court." Grell then held a news conference at which he admitted killing his daughter. At the news conference, which was video taped, Grell stated:

> We [he and Kristen] had gone to Mesa. Went to Mesa. I was going to see my sister's, my sister's house, but I decided not to. I decided to go to the store and get a few beers, and to go drinking, and drive around in the car. Took Kristen to McDonald's, um, then we just cruised around a little bit more. And I just, I didn't, I decided that I was going to go ahead and do it. I went to the gas station to get the stuff and drove around, trying to find a place where I could do it.

During the press conference, Grell also stated that Kristen woke up when he poured gasoline on her and she stood up when he lit the match and threw it on her.

¶ 14 Three weeks later Grell sent a letter to the prosecutor in which he stated, "I took my daughter's life away from her on December 2, 1999; in a very sickening way!" In the letter, Grell stated several times that he was guilty. Police investigators confirmed that the handwriting on the April 21 letter matched Grell's handwriting.

¶ 15 In consultation with his attorneys, Grell elected to avoid a jury trial and the parties submitted the case to the trial court based on stipulated facts. The court found Grell guilty of first degree murder. At the sentencing hearing, the court concluded that the State had proved beyond a reasonable doubt the existence of three aggravating factors: a prior conviction for a serious offense, A.R.S. § 13–703(F)(2) (Supp.2002); the heinous, cruel, or depraved manner of the murder, *id.* § 13–703(F)(6); and that the victim was less than fifteen years of age, *id.* § 13–703(F)(9). Finding no mitigating circumstances sufficiently substantial to call for leniency, the court sentenced Grell to death. *Id.* § 13–703(E).

## TRIAL ISSUE

 ¶ 16 Grell raises only one trial issue on appeal. He argues that the definition of "premeditation" adopted by the legislature in 1998 renders Arizona's premeditated murder statute unconstitutional. *See* A.R.S. § 13–1101(1) (2001). Grell contends that the legislature eliminated any distinction between first and second degree murder when it added the phrase "proof of actual reflection is not required" to the definition of premeditation. *Compare* A.R.S. § 13–1104(A) (2001) (second degree murder) *with* A.R.S. § 13–1105(A)(1) (Supp.2002) (first degree murder).

¶ 17 As Grell points out, proof of actual reflection has long been required to prove first degree murder in Arizona. *See Macias v. State*, 36 Ariz. 140, 149–50, 283 P. 711, 715 (1929) (holding that first degree murder requires proof that "a plan to murder was formed after the matter had been made a subject of deliberation and reflection"); *State v. Willoughby*, 181 Ariz. 530, 539, 892 P.2d 1319, 1328 (1995) ("Premeditation is estab-

lished by evidence of a plan to murder formed after deliberation and reflection."). But after the court of appeals explicitly required proof of reflection in *State v. Ramirez*, 190 Ariz. 65, 69, 945 P.2d 376, 380 (App.1997), the legislature reacted by amending the statute to say that "proof of actual reflection is not required."

¶ 18 Thus, Grell argues, if, as this court has previously held, premeditation can be proven solely by a passage of time "as instantaneous as successive thoughts of the mind," *Macias*, 36 Ariz. at 149–50, 283 P. at 715, then there can be no meaningful distinction between first and second degree murder. Accordingly, the first degree murder statute under which he was convicted is unconstitutionally vague.

¶ 19 We considered this issue in *State v. Thompson*, 204 Ariz. 471, 65 P.3d 420 (2003), and concluded that A.R.S. § 13–1105(A)(1) is not unconstitutionally vague because proof of reflection *is* required by the statute. *Id.* at ——––——, ¶ 27, 65 P.3d at 425–26, ¶ 27. The legislature's intent in adding the phrase *"proof of* actual reflection is not required" to the definition of premeditation was to relieve the State of the burden of proving with direct evidence the subjective thought process of a first degree murder defendant. *Id.* Rather, the State may prove reflection through circumstantial evidence; indeed, under most circumstances the State will have only circumstantial evidence at its disposal. *Id.* at ——, ¶ 31, 65 P.3d at 427, ¶ 31. In *Thompson*, we distinguished between the *element* of premeditation and the *evidence* that tends to establish that element (including, among other things, the passage of time). *Id.* ¶ 29.

¶ 20 Despite upholding the statute, we disapproved the use of the phrase "proof of actual reflection is not required" in jury instructions, and we discouraged the use of the phrase "as instantaneous as successive thoughts of the mind." *Id.* ¶ 32. We noted our concern that "juries could be misled by instructions that needlessly emphasize the rapidity with which reflection may occur." *Id.*

¶ 21 In Grell's case these concerns do not exist. There are no jury instructions at issue; his case was submitted directly to the trial court. More importantly, there is overwhelming evidence of premeditation. At his April press conference, Grell stated, "[w]hen I got to Mesa is when I decided to do it." He elaborated: "I decided that I was going to go ahead and do it. I went to the gas station to get the stuff and drove around, trying to find a place where I could do it." Thus, Grell's statement that he "decided to do it" and his behavior after that decision make this one of those rare cases in which the State had at its disposal direct evidence of actual reflection. Even without Grell's statements, there is overwhelming circumstantial evidence of reflection. Grell's actions that evening—purchasing a gas can, later purchasing the gasoline to fill it, then driving to a remote area—all suggest that he actually reflected on his decision to kill Kristen.

¶ 22 Nothing in this case causes us to question our reasoning or holding in *Thompson*. Because the issues that concerned the court regarding the definition of premeditation did not arise in Grell's case, we affirm his conviction for first degree murder.

## SENTENCING ISSUES

### A. *Ring–Related Sentencing Issues*

¶ 23 Grell raises four sentencing issues:

1. A.R.S. § 13–703 is unconstitutional because it allows a judge rather than a jury to find the aggravating factors that can increase a defendant's sentence to death.

2. The F(9) and F(6) aggravating factors impermissibly double weight the single fact that the victim was two years old.

3. The trial court erred in finding all three prongs of the F(6) aggravating factor (heinous, cruel, or depraved) when there was insufficient evidence to support the cruel and depraved prongs.

4. The trial court improperly weighed the aggravating and mitigating circumstances.

¶ 24 In *Ring v. Arizona*, 536 U.S. 584, ——, 122 S.Ct. 2428, 2443, 153 L.Ed.2d 556 (2002) (*Ring II*), the United States Supreme Court held Arizona's capital sentencing pro-

vision, A.R.S. § 13–703, unconstitutional insofar as it permits a judge to find the aggravating factors that permit the imposition of the death penalty. In Grell's case, the trial judge considered the aggravating factors and sentenced Grell pursuant to A.R.S. § 13–703.

¶ 25 This case has been consolidated with other death penalty cases pending on direct appeal to consider the effect of the *Ring II* decision. *State v. Ring,* Order No. CR–97–0428–AP (June 27, 2002). Therefore, these four sentencing issues are not addressed here. *See State v. Smith,* 203 Ariz. 75, 81, ¶ 26, 50 P.3d 825, 831 (2002) (announcing that if a defendant must be resentenced "or his sentence [is] reduced, all other sentencing issues are moot and need not be decided. If it later appears that the other issues are not moot, they may be raised and considered when appropriate.").

**B. Mental Retardation**

▇ ¶ 26 Grell makes two arguments regarding mental retardation. First, he contends that the trial court erred by failing to find that he is mentally retarded and appropriately weighing that factor in mitigation of his sentence. Second, and more importantly, Grell argues that the execution of a mentally retarded person violates the Eighth Amendment's prohibition against cruel and unusual punishment.

¶ 27 At his sentencing hearing, Grell presented evidence that he is mentally retarded, but failed to convince the trial court of that fact. Since the time of Grell's conviction, the United States Supreme Court has determined that the Eighth Amendment prohibits the execution of mentally retarded persons, *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), a point not at issue in Grell's sentencing hearing. Thus, we turn to the companion questions of what standards govern the determination of mental retardation, and whether the trial court

applied those standards when finding that Grell was not mentally retarded, for if the proper standards were correctly applied, then the trial court's determination that Grell is not mentally retarded may stand. If, however, the wrong standards were applied to an issue that may serve as a constitutional bar to execution, the matter must be reconsidered. We also consider the effect, if any, on Grell's case of A.R.S. § 13–703.02 (Supp. 2002), which makes the mentally retarded ineligible for the death penalty in Arizona.

**1. The *Atkins* decision**

¶ 28 After Grell was sentenced to death, the Supreme Court handed down its decision in *Atkins.* *Atkins* announced that the Eighth Amendment reflects "the evolving standards of decency that mark the progress of a maturing society," 536 U.S. at ——, 122 S.Ct. at 2247 (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)), and concluded that the Constitution " 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." *Id.* at ——, 122 S.Ct. at 2252 (quoting *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986)). Thus, *Atkins* held that mental retardation erects an absolute constitutional bar to execution.

¶ 29 *Atkins* provided some direction regarding how to determine which defendants are mentally retarded. The Court observed that "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." [1] *Id.* at ——, 122 S.Ct. at 2250. The Court recognized that an IQ below 70 to 75 indicates subaverage intellectual functioning. *Id.* at —— nn. 3 & 5, 122 S.Ct. at 2245 nn. 3 & 5. But the Court "[left] to the State[s] the task of developing appropriate

---

**1.** *Atkins* also refers with approval to the American Association on Mental Retardation's clinical definition, which states:

> *Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following

> applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

*Atkins,* 536 U.S. at —— n. 3, 122 S.Ct. at 2245 n. 3 (quoting MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed.1992)).

ways to enforce the constitutional restriction upon its execution of sentences" upon the mentally retarded. *Id.* at ——, 122 S.Ct. at 2250 (quoting *Wainwright,* 477 U.S. at 405, 416–17, 106 S.Ct. at 2605). The *Atkins* decision was issued after Grell's sentencing, so neither the parties nor the trial court knew before trial that mental retardation would serve as an absolute bar to execution.

### 2. The mitigation hearing evidence and findings

¶ 30 At the sentencing hearing, the State and Grell each presented testimony from experts regarding Grell's mental health. Both sides agreed with and applied the DSM IV definition of mental retardation, which is substantially the same as that described in *Atkins.* The DSM–IV definition requires (1) significantly subaverage intellectual functioning (IQ of 70 or below), (2) concurrent deficits or impairments in present adaptive functioning in at least two of eleven areas,[2] and (3) onset before the age of 18.

¶ 31 Grell presented experts who testified that he is mentally retarded as a result of organic brain damage and produced the results of a brain scan to support that conclusion. One of Grell's experts reviewed Grell's history of IQ testing and found that as a child he had scored 72, 67, 69, 70, 57, and 65 on various IQ tests. The expert administered another IQ test and Grell registered a score of 74. The expert discounted the 57 score, but otherwise found the scores to show subaverage intellectual functioning and to be consistent with the definition of mental retardation. The State's experts agreed that Grell's IQ scores did not eliminate the possibility that he is mentally retarded.

¶ 32 The only contested issue was Grell's adaptive functioning ability. On that issue, both of Grell's experts testified that Grell suffered from significant limitations in adaptive functioning. The State countered with an expert who testified that Grell is not mentally retarded but, rather, has an antisocial personality disorder, psychopathic personality disorder, and learning disabilities.

The expert opined that while he could not initially rule out mental retardation based on Grell's IQ scores, he concluded after interviewing Grell and reviewing his mental health history and reports that Grell was sufficiently adaptive and thus was not mentally retarded.

¶ 33 The State also presented an expert who discounted the use of the brain scans relied upon by Grell's experts. She testified that the scans were normal, and that while brain scans were medically accepted indicators of brain tumors, epilepsy, and dementia, they are not valid indicators of mental retardation.

¶ 34 After hearing this testimony, the trial court concluded that Grell "failed to prove by a preponderance of the evidence that he is mentally retarded." The trial court found the State's expert to be more persuasive than Grell's experts and found "no credible evidence that Defendant has brain damage. Thus, there is no support for [Grell's experts'] diagnosis of a cognitive disorder caused by brain damage." The court acknowledged Grell's low IQ scores, but concluded that "the tests administered to Defendant by [the State's expert] demonstrate that the Defendant has adequate adaptive skills."

¶ 35 On appeal, the only dispute is whether Grell suffers from impaired adaptive functioning. Grell argues that the State's expert had an insufficient evidentiary basis from which to conclude that Grell did not have impaired adaptive functioning, and that the only test the expert reviewed that measured adaptive functioning was administered to Grell's mother by another expert when Grell was nine years old. Thus, Grell argues, the trial judge's statement that "the tests administered to Defendant by [the State's expert]" shows that the judge misunderstood the substance of the testimony because the evidence demonstrated that the State's expert did not administer any tests to Grell.

¶ 36 The State counters that there was overwhelming evidence to suggest that Grell did not suffer from adaptive impairments.

**2.** Those eleven areas are communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, function-

al academic skills, work, leisure, health, and safety.

Moreover, the State points out that the credibility of testifying witnesses is for the trial court and that this court does not review de novo the trial court's findings. *See State v. Hoskins*, 199 Ariz. 127, 149, ¶ 97, 14 P.3d 997, 1019 (2000) (stating that even "[w]hen independently reviewing a death sentence, we adhere to the rule that the credibility of expert witnesses is for the trier of fact").

¶ 37 We agree that ascertaining the credibility of witnesses is the province of the trial court. And we agree that there was sufficient evidence before the trial court from which the judge could find that Grell had not proved he was mentally retarded *for purposes of mitigation.* But *Atkins* so changed the landscape of death penalty jurisprudence that the trial court simply could not have applied the correct principles during sentencing. When the trial judge heard evidence regarding Grell's mental retardation, she could not have known—because *Atkins* had not yet been decided—that mental retardation would serve as an absolute constitutional bar to the imposition of the death penalty. The trial court treated Grell's alleged mental retardation, as was appropriate at the time, as a possible mitigating circumstance rather than as a factor that would preclude the imposition of the death penalty. *See, e.g., State v. Williams*, 831 So.2d 835, 856–57 (La.2002) (noting, in remanding to the trial court, that "[p]rior to the trial, mental retardation was merely a factor in mitigation. Post *Atkins*, mental retardation is a complete prohibition against imposition of the death penalty.").

¶ 38 Our conclusion that the trial court decided the issue of mental retardation in a very different context than the one now existing is further bolstered by actions of the Arizona legislature. In 2001, after Grell had been arrested but before *Atkins* issued, the Arizona legislature—on the forefront of the issue of executing the mentally retarded—enacted a statute that prohibits the execution of mentally retarded persons and creates a process by which capital defendants are evaluated for mental retardation. A.R.S. § 13–703.02.

¶ 39 The statute's process for evaluating a defendant is automatically triggered when the State files a notice of intent to seek the death penalty, and involves several steps in which experts examine a capital defendant "using current community, nationally and culturally accepted physical, developmental, psychological and intelligence testing procedures, for the purpose of determining whether the defendant has mental retardation." *Id.* § 13–703.02(E). The experts submit reports and the trial court holds a hearing at which the defendant bears the burden of proving mental retardation by clear and convincing evidence. *Id.* § 13–703.02(G). A finding by the trial court of mental retardation prohibits the imposition of the death penalty. *Id.* § 13–703.02(H).[3]

¶ 40 Because the new statute was passed just months before Grell's sentencing and was given only prospective effect, it did not affect his trial. Thus, Arizona had in place a system that appears to comport with *Atkins'* principles, but Grell was denied the benefit of that system because of the timing of his trial. Although Grell presented testimony from two experts, and the State responded in kind, the adversarial procedure by which Grell's mental retardation was considered differed in nature and scope from the process created by the legislature in A.R.S. § 13–703.02, which contemplates a more thorough examination by experts selected by the trial judge, in consultation with the parties. Under the statute, mental retardation is considered individually, and not as one variable among many in the mitigation formula.

¶ 41 Due process demands that Grell's mental retardation claim receive a hearing at which the court considers the constitutional principles announced in *Atkins*. Thus, we remand to the trial court to redetermine whether Grell is mentally retarded and therefore ineligible to receive the death penalty. *Atkins*, 536 U.S. at ——, 122 S.Ct. at 2252; *see also* A.R.S. § 13–703.02.

---

**3.** Even if mental retardation is not found to bar execution, it may still be presented as a mitigat-
ing factor. A.R.S. § 13–703.02(H).

¶ 42 We recognize that the procedures set forth in section 13–703.02 are not applicable in Grell's case, as section 13–703.02 did not take effect until after Grell's sentencing. Moreover, the procedures contemplated by section 13–703.02 are pre-trial procedures, triggered when the State files its notice of intent to seek the death penalty. The trial court should use *Atkins* as a guide and should, insofar as is practical in the post-trial posture of this case, follow the procedures established in A.R.S. section 13–703.02.[4] If the trial court, after a rehearing, finds that Grell is not mentally retarded, then Grell must await further action of this court as set forth in paragraph 25 of this opinion and the court's order in this case issued this day. If, on the other hand, the trial court finds that Grell is mentally retarded, the court must dismiss Grell's death sentence and enter a constitutional sentence in its place.

## CONCLUSION

¶ 43 We affirm Grell's conviction for first degree murder, but remand for a redetermination of whether Grell is mentally retarded and therefore ineligible for the death penalty under the Eighth Amendment to the United States Constitution.

CONCURRING: CHARLES E. JONES, Chief Justice, RUTH V. McGREGOR, Vice Chief Justice, STANLEY G. FELDMAN, Justice (retired) and MICHAEL D. RYAN, Justice.

4. We note that A.R.S. section 13–703.02 appears to comport substantively and procedurally with the principles set forth in *Atkins*.